IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | 3:95CR307-1 |
| v. | : | |
| | : | |
| EDWARD JAMES WATSON | : | |

RESPONSE TO DEFENDANT'S MOTION TO REDUCE SENTENCE
UNDER SECTIONS 404 AND 603 OF THE FIRST STEP ACT

NOW COMES the United States of America, by and through Sandra J. Hairston, Acting United States Attorney for the Middle District of North Carolina, and files its response to Defendant Edward James Watson's motion for sentence reduction under Sections 404 and 603 of the First Step Act (Dkt. ## 333–35) in accordance with the Court's March 19, 2021 Order. (Dkt. #337).

## Summary

On March 10, 2021, Defendant Edward James Watson ("Watson"), through counsel, moved for reduction in sentence under Sections 404 and 603 of the First Step Act of 2018. (Dkt. ## 333–34). In the motion, Watson seeks reduction of his mandatory life plus 45 years term of imprisonment to time served on account of changes to drug sentencing laws wrought by Section 404 of the First Step Act. (Dkt. #334 at 14-15). Watson also seeks relief under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by

Section 603 of the First Step Act. Watson contends that developments in compassionate release case law, coupled with the threat of COVID-19, his serious health conditions, and his clear disciplinary record and rehabilitative efforts while in prison, entitle him to relief from his "stacked" § 924(c) firearm sentences. (*Id.* at 19-20).

Watson is eligible for sentence reduction under Section 404, as his drug offenses are "covered offenses" under the meaning of the First Step Act. The government acknowledges that some reduction is appropriate in light of both statutory and Guidelines changes since Watson's 1996 sentencing. The government disagrees, however, with the sentence calculations presented by Watson and submits a more modest reduction is warranted. As to Watson's compassionate release argument, the government agrees that Watson has shown "extraordinary and compelling reasons" on the present record and in light of current case law. Even if the Court concludes Watson's "stacked" § 924(c) sentences are appropriate grounds for a reduction under the compassionate release statute, the government submits a more modest reduction than that proposed by Watson is supported by the § 3553(a) factors.

## Background

In December of 1995, a grand jury returned a 22-count indictment charging Watson and five co-defendants in a crack cocaine trafficking conspiracy. Following a four-day jury trial concluding on February 23, 1996,

2

Watson was found guilty of Counts 1, 12, 14, and 20, conspiracy to possess with intent to distribute, distribution of cocaine base, and employing persons under 18 to distribute cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) and (b)(1)(B), and 861 (consolidated for judgment); Counts 5, 6, 7, and 13, distribution of cocaine base and employing persons under 18 to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 861 (consolidated for judgment); Counts 9, 16, 18, and 19, possession of a firearm following a felony conviction in violation of 18 U.S.C. § 922(g) (consolidated for judgment); and Counts 8, 17, and 21, each charging carrying and using a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c). (Dkt. ## 1, 99). Each of Watson's five co-defendants pled guilty earlier in February 1996, before Watson's trial. (Dkt. #324, PSR, at ¶¶ 10-14).

Prior to trial, the government filed an Information of Prior Conviction establishing that Watson had been previously convicted of three felony drug offenses, to include two 1989 convictions for sale of cocaine in Hoke County, North Carolina, and a 1991 conviction for felony possession of cocaine in Cumberland County, North Carolina. (Dkt. #304). Watson was therefore subject to increased penalties as provided in 21 U.S.C. § 841(b)(1).

On July 1, 1996, the Court sentenced Watson to a mandatory sentence of life imprisonment followed by 10 years of supervised release on Counts 1, 12, 14, and 20 (consolidated); a concurrent sentence of 30 years followed by 6

3

years of supervised release on Counts 5, 6, 7, and 13 (consolidated); a concurrent sentence of 10 years followed by 3 years of supervised release on Counts 9, 16, 18, and 19 (consolidated); and on the § 924(c) counts, consecutive sentences as follows: 5 years on Count 8, 20 years on Count 17, and 20 years on Count 21, each followed by a three year term of supervised release. (Dkt. #143). Watson's aggregate prison sentence was life imprisonment plus 45 years. The Court of Appeals affirmed. *United States v. Watson*, 129 F.3d 118, 1997 WL 702276 (4th Cir. 1997) (unpublished).

The evidence at trial established that Watson (a.k.a. "Big Boy") was the leader of a crack distribution ring operating primarily out of a mobile home park located on Purvis Court in Raeford, North Carolina. His activities were monitored through undercover agents who conducted drug transactions with him. (*Id.* at ¶ 18). Watson held exclusive reign over the Purvis Court "territory" and employed subordinates as street level dealers, who he called "the boys," which included two underage males. (PSR ¶¶ 17, 27). "The boys" would hang out in front of one of the mobile homes on Purvis Court and wait for customers to come. (*Id.* at ¶ 27). Watson generally gave each of "the boys" an average of 5 to 10 rocks of crack to sell, two or three times per week, but reserved larger quantities to sell himself. (*Id.*). Watson would let the dealers keep $20 for every $100 worth of crack sold. (*Id.*). Over the nearly two-year long conspiracy, Watson was estimated to be accountable for over 5 kilograms of crack cocaine.

4

(*Id.*).

Firearms and threats were a regular part of Watson's trafficking activities. (*Id.* at ¶ 19). He displayed weapons during drug transactions, sold weapons to undercover agents, and used them to force others into selling to him. Watson bragged that he often traded crack cocaine for firearms. (*Id.*). Watson told an undercover agent he would kill on sight anyone who tried to sell crack on the Purvis territory, which he considered his. (*Id.* at ¶ 17).

Because all of Watson's drug offenses were closely related, they were grouped (excepting the § 924(c) counts) for Guidelines calculation purposes. (*Id.* at ¶ 49). Under the 1995 version of the Guidelines, Watson's base offense level was controlled by Counts 7 and 12, charging violation of 21 U.S.C. § 861 (employing a person under 18 to distribute cocaine base). (*Id.* at ¶ 50). Watson's base offense level was 39, and he was also subject to a four-level enhancement for being an organizer or leader of a criminal activity with 5 or more participants. His total offense level was 43, (*id.* at ¶ 55), and his criminal history category was VI (*id.* at ¶ 76). With his § 851 enhancement, Watson faced a statutory mandatory life term on Counts 1, 12, and 20 under 21 U.S.C. § 841(b)(1)(A). He faced a mandatory consecutive 5 years of imprisonment on Count 8 and a mandatory consecutive 20 years of imprisonment on each of Counts 17 and 21 under 18 U.S.C. § 924(c)(1). (*Id.* at ¶ 97). His Guideline range was life imprisonment, but on Counts 5, 6, and 13, the Guideline range

was limited to 30 years by operation of the statutory maximum. On Count 7, the Guideline range was 40 years per the statutory maximum. On Counts 9, 16, 18, and 19, the Guideline range was 10 years, each count, per the statutory maximum. (*Id.* at ¶ 98). Thus, on Counts 1, 12, 20, 8, 17, and 21, the Court had no discretion in sentencing Watson to a life term plus 45 years.

Following his appeal, Watson filed a § 2255 motion and several amendments, which were denied in 1999. (Dkt. #240). Watson's motion for sentence reduction under the 2011 retroactive crack amendment was denied. (Dkt. #295). Another § 2255 motion seeking *Simmons*[1] relief was denied in 2014. (Dkt. #321). A third § 2255 motion was dismissed in 2016 for failure to obtain certification from the Court of Appeals for a second or successive § 2255 petition. (Dkt. #328).

Watson is currently in BOP custody at FCI Gilmer. *See* BOP Inmate Locator, at https://www.bop.gov/inmateloc/ (last accessed April 7, 2021). He has served just over 25 years in prison. *See* Attachment #1 (Public Information Inmate Data) at 4.

---

[1] *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011).

6

## Discussion

A. <u>Watson's Motion for Reduction in Sentence Pursuant to Section 404 of the First Step Act</u>

Section 404 of the First Step Act permits district courts to reduce a sentence for a "covered offense", *i.e.*, any "crack" cocaine offense committed before August 3, 2010, for which the statutory penalties were modified by sections 2 or 3 of the Fair Sentencing Act ("FSA"). § 404(a), 132 Stat. at 5222; *see also United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019). As relevant here, the FSA changed the conditions under which enhanced mandatory minimum penalties apply under 21 U.S.C. § 841(b)(1). Prior to the FSA, and at the time of Watson's conviction, a defendant charged with distributing over 50 grams of crack cocaine (as Watson was in Counts 1 and 20) faced a mandatory minimum sentence of 20 years with one prior conviction for a felony drug offense, and a mandatory sentence of life in prison with two prior drug felonies. The FSA changed the threshold drug amounts punishable under § 841(b)(1)(A) from 50 to 280 grams of crack cocaine, and the threshold amounts under § 841(b)(1)(B) from five grams to 28 grams, resulting in Watson's offenses falling under (b)(1)(B) rather than (b)(1)(A). The FSA also changed the type of prior conviction triggering enhanced penalties applicable to such offenses from a mere "felony drug conviction" to the new requirement of a "serious drug

7

felony."[2] Section 841(b)(1)(A) offenses now carry a penalty of ten years to life, with enhanced penalties of 15 years to life for one prior conviction for a serious drug felony or serious violent felony, and 25 years to life for those with two prior drug felonies or serious violent felonies. The sentence range for offenses of 28 grams or more became five to 40 years, and 10 years to life with at least one prior serious drug felony or serious violent felony. Pub. L. No. 111-220, § 2, 124 Stat. 2372, 2372; 21 U.S.C. § 841(b)(1)(B). The First Step Act of 2018 made those changes retroactive. *Wirsing*, 943 F.3d at 180. Even if a defendant is eligible for a sentence reduction under the First Step Act, however, *see United States v. Woodson*, 962 F.3d 812, 816-17 (4th Cir. 2020), the district court has discretion to determine whether to reduce the sentence. *United States v. Gravatt*, 953 F.3d 258, 261 (4th Cir. 2020); *see also* § 404(c), 132 Stat. at 5222 ("Nothing in this section shall be construed to *require* a court to reduce any sentence pursuant to this section.") (emphasis added).

At the time of Watson's trial and sentencing, he faced a mandatory life term of imprisonment on Count 1 (in excess of 50 grams) and Count 20 (53 grams) under the then-existing version of § 841(b)(1)(A) (enhanced) on account of having at least two prior felony drug offenses. Watson also faced a term of

---

[2] "Serious drug felony", as compared to the previous qualifier of a "felony drug offense", is defined as an offense for which the offender *served* a term of imprisonment of more than 12 months, and the offender's release from imprisonment was within 15 years of the instant offense. 21 U.S.C. § 802(57).

Case 3:95-cr-00307-CCE   Document 342   Filed 04/09/21   Page 8 of 26

10 years to life on Count 14 (19.8 grams) under then-existing § 841(b)(1)(B). Because the penalties on each of those counts were modified by the FSA, Watson's offenses are "covered offenses," and he is eligible for relief under the First Step Act. *Wirsing*, 943 F.3d at 186.

As noted above, however, it is up to the Court's discretion whether to impose a reduced sentence for Watson, and to determine the extent of any such reduction. If sentenced today, the government maintains that Watson would still face a statutory sentencing range of 10 years to life on Counts 1 and 20, *see* 21 U.S.C. § 841(b)(1)(B) (enhanced), and a maximum of 30 years on Count 14, *see* 21 U.S.C. § 841(b)(1)(C) (enhanced). *See also* U.S. Probation Office Memorandum of 4/1/21, Dkt. #340, at 1.[3] This is because Watson's § 851 enhancement remains valid under current law as to two of his prior convictions. Watson's 1989 convictions for sale of cocaine (consolidated for sentencing) qualify as a "serious drug felony," as they resulted in a sentence of eight years with all but 180 days suspended. Following Watson's service of the active portion of his sentence, his probation was revoked; he returned to prison with a 220-day jail credit on August 29, 1991. He was paroled on April 28, 1992, approximately 243 days later. (PSR at ¶ 64). Thus, Watson served a sentence

---

[3] Watson's statutory penalties on Counts 5, 6, and 13 remain unchanged with a maximum of 30 years. (Dkt. #340 at 3).

9

of more than 12 months on his 1989 convictions, and those convictions occurred less than 15 years before the commencement of the instant offense, making these offenses "serious drug felonies."[4] Given Watson's drug amounts of 50 or more and 53 grams, respectively, on Counts 1 and 20, his offenses would fall under the enhanced penalty of 10 years to life under § 841(b)(1)(B).

As for the Guidelines range that would be applicable if Watson were sentenced today, U.S. Probation's calculations reflect that Watson's Guidelines range of imprisonment is 360 months to life on the drug offenses alone. (Dkt. #340 at 2). Watson's new total offense level would be 39, and his criminal history category would remain VI. (*Id.* at 2-3). Watson's suggestion that his Guidelines range would be 235-293 months if sentenced today is premised on an incorrect assumption that the base offense level is guided by the drug quantity in which Watson was found to be "directly involved," or 222.4 grams. (Dkt. #334 at 23). Unfortunately for Watson, this is a mistaken interpretation of the Guidelines, which require consideration of all relevant conduct when calculating attributable drug quantities. *See* U.S.S.G. § 2D1.1, cmt. n.5; *see also* 1B1.3(a)(1)–(2). As described in the PSR, a "conservative estimate" of Watson's drug accountability is 5.613 kilograms. (PSR at ¶ 18). Moreover,

---

[4] As acknowledged by the U.S. Probation Office's memorandum, Watson's third prior conviction noted in the § 851 enhancement, a 1991 conviction for possession of cocaine, did not result in Watson serving more than 12 months and thus does not qualify as a "serious drug felony." (PSR at ¶ 66).

10

Watson's offenses are grouped for purposes of determining the offense level, and the highest offense level is produced by Counts 7 and 12, employing a minor, which is a level of 35. *See* U.S.S.G. § 2D1.2(a)(2) (base offense level for total attributable drug amount from § 2D1.1 (5.613 kg of crack cocaine = base level 34) plus one level). Therefore, adding the four levels for the organizer/leader enhancement, Watson's total offense level would be 39, leading to an advisory Guidelines range of 360 months to life imprisonment.

Watson is correct that the Court may properly include non-covered offenses when considering an appropriate sentence reduction, as the aggregate sentence must reflect what is sufficient but not greater than necessary punishment as a whole. In *United States v. Anderson*, 2019 WL 4440088 (D.S.C. Sept. 17, 2019) (unpub.), the defendant had been sentenced to concurrent terms on both an FSA "covered" and a "non-covered" offense. The government took the position that it was within the district court's discretion to impose a reduced sentence that had the effect of reducing a defendant's sentence on a non-covered offense. *United States v. Anderson*, 0:04CR353-CMC-3, DE 885 at 1-2. The government explained, while the crime in the second count was not a "covered offense":

> …if a defendant received a sentence for a covered offense that is concurrent to sentences imposed for a non-covered offense, the district court may impose a new sentence that has the effect of reducing the terms of imprisonment for the non-covered offense. *See, United States v. Biggs*, 05 CR 316, 2019 WL 2120226, at *3

11

(N.D. Ill., May 15, 2019)("As with any sentencing, the court considers multiple counts together; indeed, the guidelines require the court to use a combined offense level for all counts. U.S.S.G. § 3D1.1(a)(3). Because the potential reduced penalties for the covered offense could influence the range of recommended penalties for non-covered offenses, 'impos[ing] a reduced sentence as if . . . the Fair Sentencing Act . . . were in effect' entails resentencing on all counts.")

*Id.*, at 2. The same is true in the instant case.

Because the sentencing court had fashioned its original "sentence as a whole for both convictions," Anderson's eligibility on the First Step Act count "means the court has the authority and discretion to unbundle the sentence and impose a reduced sentence on both counts." *Anderson*, 2019 WL 4440088, *4, n. 2. Ultimately, the Anderson court exercised its authority and reduced the sentence imposed from 300 months, concurrent, to a term of 262 months, concurrent, on the covered and uncovered offenses. *Id.*, at *4.

Here, Watson's sentence (setting aside the § 924(c) counts for now) included three groupings of counts, all adjudged to run concurrent with one another: Counts 1, 12, 14, and 20 (life sentence) ("Group I"); Counts 5, 6, 7, and 13 (30 years) ("Group II"); Counts 9, 16, 18, and 19 (10 years) ("Group III"). Each of these grouped sentences could be modified and ordered to run concurrently as the Court finds appropriate in its discretion, within the advisory Guidelines range of 360 to life. The government contends that a sentence at the bottom of the Guidelines range, or 360 months, would be

12

sufficient but not greater than necessary to address the grouped offenses (concurrent drug and felon in possession convictions), in light of the sheer number of offenses, the quantity of drugs involved, the pervasive firearm possession, and the pernicious employment of minors in the offenses. For these reasons, a below-Guidelines sentence on the drug and firearm possession charges is not supported by the government.

B. Watson's Motion for Compassionate Release/Reduction in Sentence on Section 924(c) Counts Pursuant to Section 603 of the First Step Act

Under the compassionate release provisions of 18 U.S.C. § 3582(c)(1)(A)(i), the district court may modify or reduce an inmate's sentence "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A). If this condition is met and the motion is properly before the district court, the court must also find, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable, that "extraordinary and compelling reasons warrant a reduction" of the defendant's sentence and that "such reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" *Id*. This includes that "the defendant is not a

13

danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2), p.s. (2018).

The government acknowledges that COVID-19 may affect whether an inmate can show an "extraordinary and compelling reason" warranting compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), to the extent that (1) the inmate has a condition or characteristic that is a cognizable basis for compassionate release under the current criteria (e.g., a serious medical condition, debilitating condition, elderly offender with medical conditions, etc.) and that condition or characteristic also elevates the inmate's risk of becoming seriously ill from COVID-19 under CDC guidelines, and (2) the inmate is more likely to contract COVID-19 in his particular institution than if released.

If, after considering the § 3553(a) factors to the extent that they are applicable, a court finds that "extraordinary and compelling reasons warrant such a reduction," then the court may "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)," upon finding that such a reduction is consistent with applicable policy statements, including that "the defendant is not a danger to the safety of any other person or to the community." 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13.

14

The government acknowledges that in *United States v. McCoy*,[5] the Fourth Circuit held that BOP's policy statements outlined in U.S.S.G. § 1B1.13 do not apply to motions for compassionate release brought by defendants under § 3582(c)(1)(A)(i). The Fourth Circuit reasoned that because the Sentencing Commission has not updated its policy statements since the enactment of the First Step Act, there are no policy statements that apply to post-First Step Act motions brought by defendants. *McCoy*, 981 F.3d at 275, 281-84. Accordingly, courts have the authority to independently determine "extraordinary and compelling" circumstances warranting relief. *Id.* at 284. These circumstances can now include, according to *McCoy*, the non-retroactive change in the law effected by the First Step Act concerning sentence-stacking under Section 924(c). *Id.* at 285-88. Specifically, district courts are permitted to consider the "unusual length" of a sentence as well as the "'gross disparity' between those sentences and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." *Id.* at 285.

As *McCoy* explained, however, the policy statements remain helpful guidance. *Id.* at 282 n.7. Furthermore, *McCoy* did not hold that the existence of stacked § 924(c) sentences necessarily satisfied the requirements of § 3582(c)(1)(A)(i). *Id.* at 288. Rather, it is one factor courts can consider among

---

[5] While the mandate has issued and the decision is binding, the government may yet appeal *McCoy*.

15

a myriad of defendant-specific factors. *See id.* ("The courts took seriously the requirement that they conduct individualized inquiries, basing relief not only on the First Step Act's change to sentencing law under § 924(c) but also on such factors as the defendants' relative youth at the time of their offenses, their post-sentencing conduct and rehabilitation, and the very substantial terms of imprisonment they already served.").

The relevance of the change in the § 924(c) penalties poses an interesting question for Watson's compassionate release argument. That is so because even if Watson were sentenced under the current scheme (with the revised penalties for both his drug and firearm offenses), he could hypothetically receive a sentence of 540 months (or more) of imprisonment.[6] To date, Watson has served only approximately 303 months. *See* Attachment #1 at 4. Even were the Court to impose a reduced sentence of 540 months, Watson still would have completed only approximately 56% of that total sentence. Therefore, Watson's sentence disparity argument is not as compelling as in other cases.

---

[6] Watson was convicted of three counts of carrying and using a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), as well as the other counts described above carrying a grouped Guidelines range of 360 to life. Even if the Court sentenced Watson to the bottom of the Guidelines on the other counts (360 months), Watson would still face the mandatory minimum sentences on the three § 924(c) counts (60 months x 3 counts = 180 months). Thus, if Watson were sentenced under the current scheme, the Court could impose an aggregate 540-month sentence—360 months plus three consecutive 60-month sentences.

16

Nonetheless, in light of *McCoy*, the Court can consider a variety of other factors, including Watson's background, his clean disciplinary record, and his rehabilitative efforts.[7] The government notes that Watson was no youth at the time he committed the instant offenses. He was 32 years old at sentencing and qualified as a criminal history category VI. In that regard Watson's case bears little resemblance to that of the defendants in *McCoy*, who were significantly younger (McCoy was 19, and the other three defendants ranged from 22 to 24 years old). Watson's case also differs from that of the *McCoy* defendants in that Watson had amassed a serious criminal history by the time he had committed the instant offenses, whereas the *McCoy* defendants' history was minimal. Watson's criminal past began at age 18 when he was convicted of larceny and sentenced to a two-year suspended sentence. (PSR at ¶ 60). At age 25, his drug activity began to catch up with him: convictions for possession of cocaine, marihuana and drug paraphernalia, for which he received a 90-day sentence; and two convictions for sale of cocaine, for which he was sentenced to 8 years all but 180 days suspended; his probation was later revoked and he returned

---

[7] Before *McCoy*, the government argued that district courts are confined to the Sentencing Commission's policy statements in assessing whether "extraordinary and compelling" reasons warrant a sentence reduction. The government continues to maintain, however, that rehabilitative efforts standing alone cannot supply the basis for a reduction. *See* 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

17

to prison. (*Id.* at ¶¶ 63-64). Less than one year later he was arrested for possession of cocaine and firearm by felon; pending sentencing he was arrested for driving while revoked (*id.* at ¶ 67); he was convicted on the cocaine and gun counts and sentenced to 5 years. (*Id.* at ¶ 66). In April 1992 he was paroled; he subsequently incurred various convictions for reckless driving, no operator's license, and injury to personal property. (*Id.* at ¶¶ 68-70). In April 1995 he was arrested on charges related to the instant offense, possession with intent to sell/delivery cocaine and maintaining a vehicle for keeping and selling cocaine, and was adjudged a 10-12 month suspended sentence, 3 years intensive supervised probation and 120 days electronic monitoring. (*Id.* at ¶¶ 71-72). He violated probation by December of that year and spent 4 weekends in jail. (*Id.* at ¶ 71). By later that month, he was indicted federally. The conspiracy spanned nearly two years, dating back to at least February of 1994. (*Id.* at ¶ 15). In sum, Watson's record demonstrates a classic progression of ever-growing criminal activity, from property crimes to drug possession to firearms and drug trafficking, for which lesser terms of punishment had no deterrent effect.

The government does acknowledge that Watson's disciplinary records since his federal incarceration show he has been an exemplary inmate. Attachment #2 (Inmate Discipline Data dated 3/17/21); *Cf. McCoy*, 981 F.3d at 278 (noting that the district court "cited McCoy's rehabilitation, shown through

his many educational and vocational achievements and his payments of nearly $10,000 towards a $38,209 restitution order"). While Watson's rehabilitative strides may not equal McCoy's, he has taken educational courses and performed various jobs as described in detail by counsel. (Dkt. #334 at 26-27). These efforts are to be commended.

Watson also points to his medical conditions and the COVID-19 pandemic as supporting his contention that "extraordinary and compelling reasons" compel a reduced sentence. Watson does have several medical conditions that may be found to be extraordinary and compelling in the context of COVID-19, but each of these conditions appear to be appropriately managed. Sealed Attachment #3 (BOP Health Services Records). Watson is obese, with a BMI of 39 kg/m². (*Id.* at 1). He has Type 2 diabetes, hypertension, and various other conditions. (*Id.* at 2, 56-58). He takes medications for diabetes, hypertension, high cholesterol, neuropathy, and diabetic retinopathy. (*Id.* at 2-3). According to intra-system transfer documentation completed November 13, 2020, Watson's A1C (blood sugar level) was 7.0 or "at goal," and the provider noted "No hypoglycemia" and to continue his current medications. (*Id.* at 46).

On December 21, 2020, Watson tested positive for COVID-19. (*Id.* at 6). He was placed in isolation and monitored daily for symptoms until January 4, 2021. (*Id.* at 6-7, 49, 51-52). There is no record of Watson having suffered any severe symptoms, or any symptoms at all for that matter. (*Id.*). On March 3,

19

2021, Watson received his first dose of the Pfizer-BioNTech COVID-19 vaccine. (*Id.* at 64). He received his second dose of the vaccine on March 24, 2021. Sealed Attachment #4.

Conditions at FCI Gilmer have continued to improve from the height of the pandemic. FCI Gilmer currently houses 1,501 inmates (1,465 inmates at the FCI and 36 inmates at the adjacent Camp). *See* https://www.bop.gov/locations/institutions/gil/ (last accessed April 8, 2021). Of those, *no* inmates are reported positive at present; only 3 staff members are currently positive. *See* https://www.bop.gov/coronavirus/ (last accessed April 8, 2021). One inmate, sadly, died of COVID-19 at Gilmer, while 305 inmates and 65 staff members have recovered. *Id.* Given the low numbers currently reported at FCI Gilmer, it appears that BOP has successfully mitigated the infection rate at this facility. Moreover, BOP has continued administering vaccines to staff and inmates, pursuant to its January 2021 guidance. *See* COVID-19 Vaccine Guidance, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021 _covid19_vaccine.pdf (last accessed April 8, 2021). As of April 8, 2021, 134 staff members and 651 inmates, including Watson, had been fully inoculated at FCI Gilmer. *See* Federal Bureau of Prisons, COVID-19 Vaccine Implementation, at https://www.bop.gov/coronavirus/ (updated at 3 p.m. each weekday).

20

The government acknowledges that, had Watson *not* been inoculated, his risk of severe illness from COVID-19 would be increased due to his obesity, Type 2 diabetes and hypertension. That said, Watson already had COVID-19 and recovered without any apparent adverse effects. And he has now been fully inoculated. Attachment #3 at 64; Attachment #4. This circumstance alone demonstrates that BOP's mitigation efforts and priority distribution of vaccines in accordance with its published guidance is working. Inmates are being vaccinated and provided the protection they need, especially among high-risk populations. Courts have responded accordingly, denying compassionate release to inmates who have received both doses of the vaccine, and even in some cases to inmates who received only one dose of the vaccine. *See, e.g.*, *United States v. Cortez*, 2021 WL 689923 (D. Ariz. Feb. 23, 2021) (relief denied to inmate who received both doses of Pfizer vaccine); *United States v. Wakefield*, 2021 WL 640690, at *3 (W.D.N.C. Feb. 18, 2021) (relief denied to inmate who recovered from COVID-19, and also received first dose of vaccine; defendant had obesity, diabetes, and hypertension); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021 (relief denied to inmate who received both doses of vaccine; inmate suffered from several chronic medical conditions); *United States v. McGill*, 2021 WL 662182, at *5 (D. Md. Feb. 19, 2021) (relief denied to inmate who both recovered from COVID-19 and received first dose of vaccine); *United States v. Smith*, 2021 WL 364636, at *2 (E.D.

21

Mich. Feb. 3, 2021) (relief denied to inmate who received Moderna vaccine); *United States v. Beltran*, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (relief denied to inmate who received first dose of vaccine); *but see United States v. Sandoval*, 2021 WL 673566 (W.D. Wash. Feb. 22, 2021) (granting relief to 65-year old inmate with numerous risk factors despite having received first dose of Moderna vaccine). In light of this circumstance, the government argues that Watson's medically-based argument for compassionate release does *not* constitute "extraordinary and compelling" reasons standing alone.

C. Any Reduction Watson Receives Must Reflect the Seriousness and Number of His Offenses.

Focusing on Watson's First Step and *McCoy*-based arguments, the government, as acknowledged above, agrees that some level of sentence reduction may be warranted in Watson's case. The Court must, nonetheless, assess the sentencing factors listed in 18 U.S.C. § 3553(a) as well as Watson's post-sentencing conduct, to determine the extent of any sentence reduction. Here, Watson has served only just over half of the sentence he would receive even under the current law and at the bottom of the Guidelines (303 months out of a hypothetical 540 months), which weighs against his release at this time. *See, e.g., United States v. Williamson*, 2021 WL 309067, at *7 (M.D.N.C. Jan. 29, 2021) (denying relief even in light of *McCoy*; defendant had received executive clemency reducing life sentence to 30 years, which was bottom of

22

currently-applicable Guidelines range); *United States v. Collazo*, 2021 WL 632678 at *4 (E.D. Pa. Feb. 18, 2021) (relief denied where defendant had served 25 years of 169-year sentence for stacked 924(c) offenses; defendant had violent criminal history and even under current law stacked sentences would total 54 years); *United States v. Gordon*, 2020 WL 2896910, at *3 (S.D. Ohio June 2, 2020) (holding that even if changes to § 924(c) were retroactive, defendant would have stacked sentences totaling 35 years, which he has not yet served).

The government further contends that reducing Watson's sentence to time served as advanced by counsel would not reflect the seriousness of his offense. *See, e.g.*, *United States v. Norwood*, 2021 WL 274508, at *1 (3d Cir. Jan. 27, 2021) (unpub.) (finding no abuse of discretion where district court denied compassionate release for defendant serving 500-month sentence for bank robbery, carjacking, and two 924(c) counts, due to severe nature of the offenses); *United States v. Turner*, 2021 WL 684159, at *6-7 (S.D. Miss. Feb. 22, 2021) (denying relief from a 1000-month sentence given nature of the offenses, including armed robbery and shooting a police officer); *United States v. Fuller*, 2020 WL 5849442, at *3 (S.D.N.Y. Oct. 1, 2020) (denying relief based on stacked 924(c) offenses where Guidelines range was life and court would have imposed that sentence based on defendant's numerous violent acts as gang leader). Watson was the leader of this drug trafficking conspiracy. He employed minors as dealers and used firearms to carry out his activities,

23

threatening violence to those who would encroach on his territory or fail to do his bidding. He was found accountable for over 5 kilograms of cocaine base. These are not the characteristics of a young or impressionable first-time defendant caught up in a sentencing scheme that overstates his criminal responsibility. Watson was an experienced felon whose status and authority in the conspiracy was undoubtedly buttressed by his past record as well as his large collection of firearms.

On balance, the government contends Section 404 and the § 3553(a) factors may support a reduction of Defendant's life sentence but submits that a reduction to time-served is not appropriate in light of the above-mentioned factors. A modest reduction would account for the changes to the law under the First Step Act, Watson's rehabilitation and clear record while incarcerated, and the 25 years already served, but still account for the nature and seriousness, and number of, his convictions.

<u>CONCLUSION</u>

In light of the foregoing, the government suggests a modest sentence reduction may be warranted but defers to the Court's sound discretion concerning the appropriate sentence for the defendant.

This the 9th day of April, 2021.

Respectfully submitted,

SANDRA J. HAIRSTON
Acting United States Attorney


/S/ JULIE C. DOMACHOWSKI
Assistant United States Attorney
NCSB #29365
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth St., 4th Flr.
Greensboro, NC  27401
Phone:  336/333-5351

25

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 9, 2021, I electronically

filed the foregoing with the Clerk of Court using the CM/ECF System, which

will notify the following registered CM/ECF users:

    Talisha Griffin, Esq.
    David Simpkins, Esq.

           Respectfully submitted,

           SANDRA J. HAIRSTON
           Acting United States Attorney

           /S/ JULIE C. DOMACHOWSKI
           Assistant United States Attorney
           NCSB #29365
           United States Attorney's Office
           Middle District of North Carolina
           101 S. Edgeworth St., 4th Flr.
           Greensboro, NC  27401
           Phone:  336/333-5351